By the Court—Bosworth, Ch. J.
The plaintiff has recovered a verdict against the defendant for an assault and battery committed upon him on the 16th of June, 1857, in the rear of the City Hall of the City of Kew York. The injury was inflicted by some person or persons in a crowd collected at the place where the violence was suffered. The defendant was not present when the injury was committed, nor was he one of, or in sight of, the crowd from which it proceeded.
The complaint alleges that the persons who injured the plaintiff, “ acted under the orders and directions of the defendant, who commanded and incited them to commit the •said assault upon him.” The answer “denies that the persons mentioned in plaintiff’s complaint, or any other person •or persons, acted under the orders or directions of this *21 defendant, in committing any assault.upon the plaintiff; defendant denies that he incited or comhianded said persons, or any person or persons, to commit any assault upon the plaintiff.”
These allegations present the only questions of .fact raised by the pleadings, except the question whether the plaintiff was assaulted while in the peaceable discharge of his duty as a policeman.
A few weeks prior to the transaction in question, the existing Metropolitan Police Act took effect. The Mayor and certain members of the police force did not recognise the validity of this statute, nor the authority of the Commissioners of Police created by it. The crowd was composed mainly of these disaffected or insubordinate members of the police force, and had been assembled by order of the defendant, and are called in this case, the Municipal Police. The defendant insisted that he assembled them solely to resist the expulsion by force, of Turner, the Deputy Street Commissioner, from his office. The Street Commissioner had then recently died. Mr. Conover had been appointed by the Governor to fill the vacancy, and was making vigorous efforts to obtain possession of. the office, and of the property pertaining to it. The plaintiff insisted that the assembly was convened to resist the-service of process on the defendant, and to obstruct the Metropolitan Police, (as those are called who recognized the new law,) in the performance of their duty. The judge declared this crowd or assembly to be,, as matter of law, an unlawful assembly. Prior to the assault complained of, the Coroner had been to the Mayor’s office to serve an order of arrest upon him. He did not see the defendant", but had conversation'with-an officer stationed at the door of defendant’s office; and he and that officer are in direct conflict, as to what was then said by either' of then? to the other. After that, and on the same' day, the Coroner returned with a posse consisting of members-of the Metropolitan Police, for the purpose of serving, that order of arrest.
*22 They had a conflict with the crowd or Municipal Police at the rear entrance to the City Hall; the plaintiff was one of the Coroner’s posse, and was injured. This suit is brought to recover damages for that injury. This brief statement will make those portions of the charge, which we have specially considered, intelligible, and their application obvious.
The Judge charged, that “there is no proof that the defendant gave any direct command that this attack and assault should be made,” “ and the great question before us is, whether the Mayor, (the defendant in this action,) incited or commanded the men who committed this assault—assuming that they did commit it—to do it.”
The Judge also instructed the Jury that the act of April, 1857, (ch. 569), entitled, “An act to establish a Metropolitan Police District, and to provide for the government thereof,” took effect from and after the first meeting of the Board of Police created by it, and that such first meeting was held on the 23d of April, 1857.
That from and after that event, the power of the old Board of Police was at an end. That its right to act as an organized body for the- preservation of the public peace was gone. That the act of the defendant, in attempting to perpetuate the organization of the old police, after the first meeting of the new Board of Oommissioners under the new laws, and in supplying by new incumbents the places of* those who united with the new police, was illegal; “and the body of men thus organized by him under the nam'e of police, was an illegal body, in so far as it assumed to be a police organization.”
■“ This body of men were assembled in the City Hall on .the morning of June 16, 1857, principally by directions of the defendant, * * -* * and I feel bound to say, that the meeting in question constituted an unlawful .assembly.” (The defendant excepted to this instruction.)
“The Court, on the evidence before it, pronounces, as ¿matter of law, that the assemblage was unlawful; for it .holds that the assembling together of an illegal force, *23 armed, and with circumstances to create terror, or to provoke to a breach of the peace, of itself constitutes the meeting unlawful. Did its illegality depend on the motive of the act, or the object of the meeting only—and. there was doubt on that question—upon the evidence, it would have been your province to have decided, whether or not this was an unlawful assembly.” (The defendant excepted to the instruction “ that there was no question for the Jury as to the character of the assembly referred to, and that, as matter of law, it was unlawful.”)
The Judge also charged, that “even if it be admitted that the object for which this force was thus assembled was that contended for by the defendant, to wit, the protection of Mr. Turner, the then acting Street Commissioner, in the possession of his office and its properties, against the threatened violent attempts of Mr. Conover, with the assistance of the Metropolitan Police, or others, to wrest that possession from him, the assembling of this force for that purpose was illegal.” (To this instruction the defendant excepted.) #
He also charged, that conceding Turner to be the lawful incumbent of the office; that he and not Conover was in the actual possession of it, “ and that the Mayor, in his discretion, was authorized, as chief magistrate of the city, to interpose by force, if necessary to prevent his ouster; this could be done lawfully, only by the employment of the Metropolitan Police force itself.” (To this instruction the defendant excepted.)
“And it is no answer to this to say that that was the very body from which the wrong was apprehended.” (To this proposition the defendant excepted.)
“It makes no difference either, that the apprehension of a violent attempt, on the part of the Metropolitan Police, to force Mr. Conover into this office may have been well ‘ .founded;” (To this proposition the defendant excepted.
“There is no aspect of the question which this case presents in which the Court can do otherwise than pronounce *24 the act in question an illegal act.” (To this proposition the defendant excepted.)
Having instructed the Jury that this assembly was an unlawful assembly, the Judge then proceeds to state the rules by which the liability of the defendant, for the acts of the persons composing it, was to be tested and determined.
He charged the Jury that “the plaintiff” [at the time and place, when and where he was injured] “was there as a part of a posse comitatiis, raised by the Coroner to aid him in the service of civil process; not as a policeman, acting under the orders of a police commander.”
He also charged that if the Jury believed “ the object of the assemblage was to protect the Deputy Street Commissioner in the peaceable possession of his office, and neither resistance to legal process, nor the prevention of the entry of the Metropolitan force, or any part of it, into the City Hall formed any part of such object, then the defendant is not responsible, unless you shall find he knew before the fight that the Coroner had been to his office to serve him with a warrant, «and took no measures to secure a free entrance to him, or shall find that the Coroner made proclamation at the entrance of the hall of the object of his visit, and was resisted by the Municipal force.” (To this instruction the defendant excepted.)
Is it a sound proposition that this was, as matter of law, an unlawful assembly, if it be conceded that it was brought together solely to prevent Conover from expelling Turner from the Street Commissioner’s office by force, that Turner was the lawful incumbent of the office and in possession of it, and that the Mayor, in his discretion, was authorized, as chief magistrate of the city, to interfere by force, if necessary, to prevent his ouster? The Judge charged, that conceding such to be the facts, the assembly • was an unlawful one.
The reason why, on such a state of facts, the Judge declared that the assembly, as matter of law, was an unlawful one, seems to be based to some extent on the idea that the Metropolitan Police was the only force that *25 could be used for that purpose; and that, if that body was the one by which the apprehended wrong and violence were to be committed, they must be submitted to, and resistance would be unlawful.
We do not so understand the law. The Metropolitan Police Act (Laws of 1857, ch. 569,) confers no license upon the board of police thereby constituted, nor upon any member of the police force, to invade the rights of persons or of property. Nor does it deprive any citizen of the right of defending himself against a wanton and unprovoked assault, or of defending his own property, or that which he is charged with the duty of protecting, against attempts to seize it forcibly, without right, and, without process of law, though the wrongdoer may be a Metropolitan policeman, or any other officer charged with the duty of preventing a breach of the peace.
Section five of that act declares that it shall be the duty of the board of police thereby constituted, “ at all times of the day and night, within the boundaries of the said,
* the Metropolitan Police Districtto preserve the public peace; to prevent crime, and arrest offenders ; to protect the rights of persons and of property,” &c.
The Metropolitan policemen can find no warrant in the' act under which they are appointed, for forcibly and without process of law expelling a legal incumbent from his office, and installing another person in his stead.. Nor is there anything in that act making it unlawful to use any means to resist such an attempt, which might lawfully be employed, if any other persons were about to perpetrate the same outrage.
If it be conceded that Turner was the lawful incumbent of the office; that he and not Oonover was in the actual possession of it, and that the Mayor, in his discretion, was authorized, as chief magistrate of the city, to prevent the ouster; we have no doubt that he might lawfully employ as such force any citizens who were willing to aid him in resisting the threatened expulsion of Mr. Turner from his office.
*26 It is elementary law that a man is justified in using the force necessary for the defense of his wife, child, or servant, or the possession of his property. So, also, that a child may justify in defense of a parent, or a wife in defense of her husband, or a servant in defense of his master.
So it has been held that, though a warrant has been issued, if it be not enforced by a proper officer, or if it be executed out of the jurisdiction without being backed by the proper magistrate, or if the wrong person be taken under it, the party may legally resist the attempt to apprehend him, and even third persons may lawfully interfere to oppose it, doing no more than is necessary for that purpose. (1 Chit. Cr. Law, 60, [61;] The King v. Osmer, 5 East, 304; Adey's Case, 1 Leach, 206; 1 East P. C., 295, 310, 325; Fost. Cr. L., 312; see 7 Cow., 269; 5 Denio, 352; Elder v. Morrison, 10 Wend., 128; The People v. Hubbard, 24 Id., 369; and Curtis v. Hubbard, 1 Hill, 336.)
In Phillips v. Trull, 11 J. R., 486, it was affirmed by Platt, J., without any dissent by the other Judges, that “any person whatever, if an affray be made, to the breach of the peace, may, without warrant from a magistrate, restrain any of the offenders, in order to preserve the peace,” although after the affray is at an end no private person can, of his own authority, arrest the offender. (See also, Holley v. Mix, 3 Wend., 350, and Scribner v. Beach, 4 Denio, 448.)
It has also been held, that riding in a body to quell a riot is lawful, and no information will be granted for small irregularities in the pursuit of such a design. (1 Chit. Cr. L., [18;] see Handcok v. Baker et al., 2 B. & P., 264; Wharton’s Am. Cr. L., 728; and Russell on Crimes, [8 Am. ed.,] vol. I, p. 266.)
Power is conferred by statute on mayors of cities “to cause to be kept, all laws made for the preservation of the public peace.” (2 R. S., 704, § 1.) Every person who, in their presence, shall threaten to beat another, “or to commit any offense against bis person or property,” may be ordered by them, without any other proof, to give security *27 to keep the peace; and in case of refusal so to do, may be committed by them to prison, by warrant, until the prescribed security be given. (Id., 705, § 8.)
If the Mayor had been present when an attempt was made by force, without process of law, to eject Mr. Turner from his office, and take from him the property connected with and pertaining to it, he might not only have used the force requisite for the preservation of the peace, but he might have ordered all' persons engaged in the unlawful act to give security to keep the peace; and on their refusal to comply with the order, have issued a warrant and committed them to prison.
The chief magistrate of a city, vested with the power and clothed with the duty of causing all laws made for the preservation of the public peace to be kept, having information that an assemblage of men is about to eject by force and without process or authority of law, an officer of one of"the departments of the City Government, from his office, and take from his possession and control the property belonging to it, and having reason to believe that this assemblage of men was to be composed of those specially charged with the duty of preserving the public peace, and of protecting the rights of persons and of property, (Laws of 1857, ch. 569, § 5,) who should take no measures to prevent the outrage, would be censured as derelict in duty, and unfit to hold the office to which he had been elected.
As we understand the charge of the Judge, he instructed the Jury that the assemblage of men convened by the Mayor, though convened for such a purpose, and for such a purpose only, was, as matter of law, an unlawful assemblage.
And we understand him to have so charged, partly on . the idea, that if the Metropolitan policemen were about to commit such an act of unauthorized violence, they could not lawfully be resisted by the Mayor; at all events, that he coxdd only call to his aid Metropolitan policemen. That although the assembly was convened for a lawful *28 purpose, and to prevent the perpetration of a wrong which the Mayor in his discretion might use force to prevent, yet the assembly was an illegal one, for the reason in part, that only Metropolitan policemen could be employed by the Mayor, to prevent such an unlawful act.
In this, we think the learned Judge fell into an error.
If the sole object of convening the assembly was to prevent the expulsion of Turner by force from an office of which he was the lawful incumbent, the assembly was not, necessarily, as matter of law, an unlawful one. An assembly is an' unlawful one, where three or more persons assemble themselves together to do an illegal act. (4 Bl. Com., 146; 3 Inst., 176.) So any meeting assembled under such circumstances as, according to the opinion of . rational and firm men, are likely to produce danger to the tranquillity of the neighborhood, is an unlawful assembly. Reg. v. Vincent, (9 C. & P. 91; Reg. v. Neale et al., Id., 431.) It is stated in elementary treatises and in adjudged cases, that the difference between an unlawful assembly and a riot is this: If the parties assemble in a tumultuous manner and actually execute their purpose with violence, it is a riot; but if they merely meet upon a purpose which, if executed, would make them rioters, and having done nothing, they separate without carrying their purpose into effect, it is an unlawful assembly. (Rex v. Birt et at., 5 P. & C., 154; 4 Bl. Com., 146; 3 Inst., 176; Russell on Crimes, [8 Am. ed.,] vol. 1, pp. 266, 272, 273; Archbold Cr. Pl., [Waterman’s ed.,] vol. 2, p. 934, note [1,] and pp. 937, 942 and 945.)
If the assembly was convened by the Mayor solely to prevent the forcible expulsion of Turner from his office, without process of law, then it was not unlawful, by reason of the purpose or object of its meeting. If claimed to be unlawful, by reason of "the circumstances under which it appeared, and the manner in which the persons composing it were conducting themselves, the question whether these circumstances and this conduct were such as would *29 frighten and alarm—not any foolish or timid person—but persons of reasonable firmness and courage, was one which it belonged to the jury to decide. (Reg. v. Vincent, 9 Car. & P., 91; and Reg. v. Neale et al., Id., 431.)
The persons so assembled were individually members of the police force of the city, in a state of insubordination, in the sense that they did not recognize the new Police Act, or the authority of the Oommissiouers of Police created by it. They wore the uniform of conservators of the peace, a uniform which they were accustomed to wear; and the only weapons of offense and defense which they had, they had carried daily and publicly for years. The evidence tending to show that they acted in a tumultuous manner, or evinced any purpose to move from the place where they were stationed, or to do any act except in resistance of an attempt to expel Turner from his office, if there be any, is exceedingly slight. Assuming that it was the sole object of their meeting to protect Turner and the property belonging to his office from lawless invasion, and that no order for the arrest of the defendant had been made, so that no collision had in fact occurred between them and the Metropolitan Police or any other perstms, it is far from being clear that an indictment against them as an unlawful assembly would be sustained by the verdict of a Jury.
The conduct of the defendant and of all who acted with him in their opposition to the execution of the Metropolitan Police Act, in so far as his or their resistance was forcible, and was continued and maintained by declarations and orders calculated to bring the law into contempt, was in a high degree reprehensible. That when the law-making power had enacted and promulgated the law, neither the defendant, in his exercise of the high functions pertaining to his office, nor any citizen, however humble, can be justified in resorting to other than peaceful means to test its constitutional validity, is quite clear; and when the defendant assumed, by addresses and orders, to keep up the existing organization and compel its members to yield him obedience, he abused the authority he had theretofore *30 exercised over the body, and the proper influence of his office.
And in conduct such as this he acted illegally, and the organization which he so kept together was an illegal organization. 'This is settled by the decision of the Court of Appeals in The People v. Draper, (15 N. Y., 532,) and is not open here, and was not questioned on the trial of this cause. Had the Judge on the trial confined himself to this view of the defendant’s conduct, and in this sense pronounced it illegal, and the assemblage, in so far as it constituted a part of an organization for the preservation of the peace of the city, an organization existing or kept up without warrant of law, certainly it would not have been erroneous.
But it by no means follows from this that any members of the so-called Municipal Police, convening for a lawful object in a peaceful manner, not to commit overt acts of violence, but only to resist them, if illegally made, was an unlawful assembly in the sense in which that term is used in the law.
The fact that the persons composing this assembly continued to act as policemen under the organization existing, and the laws in force at the time the act of April 15, 1857, took effect, and that they did not recognize the authority of the Police Commissioners created by that act; and whatever they did from day to day as an organization, tending to show a connection between their hostility to that act and the purpose of their meeting on the occasion in question, may properly be considered with the other evidence given, in determining whether they were then assembled to do an illegal act; or whether they were convened under such circumstances as, according to the opinion of rational and firm men, were likely to produce danger to the tranquility of the neighbourhood.
If they were assembled to do an illegal act, whether that act was resistance to the service of process, or an interference with the Metropolitan policemen in the per *31 formance of any of their duties, then the assembly was unlawful.
But if they met for a lawful purpose, and if there was nothing in the manner in which they conducted themselves justly calculated to produce alarm or endanger the public tranquility; if their whole purpose was to prevent an act which would be a breach of the peace, and not in any event to do anything wrong in itself, or in an improper manner; their general attitude in regard to the act of April 15, 1857, would not, as matter of law, make the assemblage in the supposed case an unlawful one, and indictable as such.
Whatever may have been their hostility to the new Police act, if they were not assembled with any reference to that subject on the occasion in question, that hostility would not, of itself and alone, make the assembly, necessarily, as matter of law, an unlawful one. Three or more of these insubordinate policemen could meet for a lawful purpose, and conduct in an orderly manner, and such a meeting would not constitute ah unlawful assembly merely because they did not divest themselves of the uniform and lay aside the clubs of policemen.
The judge did not charge contrary to these views. He charged that the body of men organized by the defendant, under the name of police, in attempting to perpetuate the organization of the old police, “ was an illegal body, in so far as it assumed to be a police organization.”
But in enumerating the circumstances which he grouped together, and which, in his view, made the assembly unlawful; in addition to the number of persons assembled, the uniform in which they appeared, the weapons they carried, and the organization under which they acted; he assumed and stated “that there could have been no rightful object to be accomplished by such an assemblage so ostensibly acting as a police, which might not have been done and lawfully done by the sworn conservators of the peace—the legal police of the city, then in full force and organization.” This latter fact, assuming *32 it to be established by the evidence, is one entitled to great consideration. But if it be true, or if it be established by the evidence, that the legal police force of the city was about to expel Turner from- his office by violence; and if . the Mayor, in his discretion, might" lawfully interpose by force to prevent this, and if the assemblage wds convened by the Mayor solely to prevent such an expulsion; then there was a rightful object to be accomplished by this assemblage which could not have been then accomplished through the agency of the "Metropolitan Police.
We think, therefore, that it is a sound proposition, that the services of the Municipal Police' might be employed for a lawful purpose and in such a manner that a body of them met for that purpose, and acting in that manner, would' not be subject to indictment as constituting an unlawful assembly.
To suppose an extreme case, we may suppose that the Mayor knew of the purpose of a body of men to commit a riot, and believing that the Municipal Police would faithfully aid him in preventing or suppressing it, he thereupon .convened at a convenient point, as large a number as on the present occasion, and in fact used them successfully, in a proper manner, to quell a riot; we think it quite clear that, as an assembly so convened and thus acting, they could not be regarded as an unlawful assembly within the common law meaning of that term.
And, in view of all the evidence, we think it was a question for the Jury, under proper instructions as to the law, whether the assembly in question was or was not an unlawful one.
If the assembly was not an unlawful assembly, the defendant is not liable for the wrongs of individual members of it, having no connection with the object for which it was convened, to which he was in no way privy, and of the purpose to commit which he had no knowledge or suspicion.
The Judge evidently considered this to be the law. For, although he charged, that as matter of law, the assembly *33 was an unlawful one, yet he also charged (5th) that if its object “was to protect the Deputy Street Commissioner in the peaceable possession of his office, and neither resistance to legal process, nor the prevention of the entry of the Metropolitan Police force, or any part of it, into the City Hall formed any part of such object, then the defendant is not responsible, unless you shall find he knew before the fight that the Coroner had been to his office to serve him with a warrant, * * and took no measures to secure a free entrance to him, * * or shall find that the Coroner made proclamation at the entrance of the hall of the object of his visit, and was resisted by the Municipal force.”
This instruction (rejecting the concluding alternative) concedes that the defendant is not liable, if the object of the assemblage was such as it recites, provided he did not know before the fight that the Coroner had been to his office to serve Mm with a warrant.
And, with reference to the evidence as to the intent of the defendant, the Judge also instructed the Jury in these words, viz.: “Before, however, I leave this subject, in regard to the intent, it is proper that I should say that the Mayor, whose examination was certainly very close, and whose answers were very deliberately given, most unequivocally and expressly denies that the object of assembling that force on that day had any connection whatever with an anticipated arrest.”
So that, had the cause been submitted under the instruction now under consideration, (excluding the concluding alternative,) the verdict would have been for the defendant, if the Jury had credited this unequivocal and express declaration of the defendant, that the object of the assemblage had no connection whatever with an anticipated arrest, and had also found that it was no part of its object to prevent the entry of any part of the Metropolitan Police into the Oity Hall, and that the defendant did not know, before the fight, that the Coroner had been to Ms office to serve him with a warrant.
And if it be true that the sole object of the assemblage *34 was to protect Turner in the possession of his office, and that it was no part of its object to resist the service of legal process or prevent the Metropolitan Police force from entering the City Hall, and that the defendant did not know before the fight that the Coroner had been to his office to serve him with a warrant, and that in such ease the defend-: ant is not liable in this action, (as the charge distinctly states,) even though the assembly was unlawful; it is difficult to conjecture on what principle he is to be held liable, merely because “ the Coroner made proclamation at the entrance of the hall 'of the object of his visit, and was resisted by the Municipal Police.”
That resistance had no connection (in the case now supposed), with the object of the assembly, was not an act to which the Mayor assented, nor one which he anticipated, and was wholly foreign to any purpose or anticipation of his in convening this assembly.
This proposition assumes, (what the Judge in another part of his charge expressly declared,) that although this was an unlawful assembly, the defendant is not necessarily liable for all of its acts, merely because he convened it. And if it be law, that on all the facts stated in the above 5th proposition being found in the defendant’s favor, except the fact of the Coroner’s making proclamation and being resisted as there stated, the defendant is not responsible; then the Judge clearly erred in holding that under such circumstances the fact that the Coroner made proclamation at the entrance of the hall of the object of his visit, and was resisted by the Municipal force, would make him responsible.
Such a rule charges the defendant with the consequences of that resistance, although he was not present, and knew nothing of the proclamation or of the resistance, and did not authorize or contemplate the resistance, or subsequently assent to it; and so charges him solely on the ground that a proclamation was made which he did not and could not hear, while it at the same time holds that he would not be liable if no proclamation had been made.
*35 We think this view of the law erroneous, and that the error in this part of the charge entitles defendant to a new trial.
The defendant’s counsel insists, (and he argued the proposition as being, in his judgment, of paramount importance,) that a Coroner, when acting in the service of an order of arrest, cannot call to his aid the power of the county. The Judge charged that he had authority to call the power of the county to aid him, in effecting service, if such aid was necessary; and the defendant excepted to the instruction.
The Judge also charged: “That if the Coroner had no authority for the employment of this force, then the plaintiff was not justified in the attempt to enter the hall. The plaintiff was there as a part of a posse comnitatus, raised by the Coroner to aid him in the service of civil process, not as a policemen acting under the orders of a police commander. If resistance at the hall to the plaintiff, as a member of the posse, was not, under the circumstances, unlawful, it did not become so by reason of the plaintiff being a member of the police. The plaintiff was bound to follow the Coroner, as a member of his posse, when summoned, at the hazard of being deemed guilty of a misdemeanor if he did not; yet he took the risk of the Coroner’s authority.”'
* * “ The employment of the posse without necessity, is a great offense; for it is a cardinal principle that, in the service of process, the Sheriff [or a Coroner] ‘must not be guilty of oppression, nor make use of other force nor greater violence than the thing requires.”
“The plaintiff was justified by the actual command which he received from the Coroner, to act as one of his posse on this occasion.”
In the present case, Coroner Perry held an order, made in a civil action, requiring- the defendant to be arrested and held to bail. Although designated as process, in the case and in the charge of the Judge, it was an order to arrest and hold to bail.
The Code, in section 185, declares how the order shall be executed, and provides that the Sheriff “may call the *36 power of the county to his aid in the execution of the arrest, as in case of process.” This section certainly grants this power to the Sheriff, and authorizes him to employ it “to his aid in the execution of the arrest.” (See Howden v. Standish, 6 Man., G. & Scott, 504.)
Section 419 enacts that “if the Sheriff be a party” to any “summons, order or judgment” which is to be served or executed, “the Coroner shall be bound to perform the service, as he is now bound to execute process where the Sheriff is a party; and all the provisions of this act relating to Sheriffs shall apply to Coroners when the Sheriff is a party.”
These sections authorize the Coroner to call to his aid the power of the county in executing an order of arrest. Whether he found, or had reason to apprehend that resistance would be made to the execution of the order, was a question for the Jury, if the determination of it was material to a just disposition of the action.
So, too, was the question whether the Coroner made known to the persons assembled in the rear of the City Hall the object of his visit; or whether under the circumstances and upon the evidence they had reason to suspect any other purpose than to assail and disperse them, as a part of the means devised to expel Turner from his office and intrude Mr. Conover into it, or from some other motive which they were left to conjecture.
We think the Coroner, in one view of the evidence, may have been justifiable in summoning persons to aid him in executing the order, and at the same time that the defendant may not be liable for the assault.
If the Coroner had previously been to the office of the defendant to execute the order, and then told the officer stationed at the door of- defendant’s office that he was one of the Coroners of the city and had an order for the arrest of the Mayor issued from the Superior Court, and requested that officer to so inform the Mayor, and if that officer then went into the Mayor’s office, and, on returning, stepped up to him, put his hands on his arm and said *37 “ Coroner, I am sorry to say that I have orders to put you out of the office,” the Coroner might well apprehend resistance to his execution of the order, and be justified in calling to his aid the power of the county.
And yet, if it was at the same time true that the Mayor had not been informed, and had no reason to suppose that the Coroner had been there to serve the order of arrest, and did not know that an order for his arrest had been issued, and if it was no part of the object of convening the assembly to resist the service of process, or the Metropolitan policemen in the performance of their official duties, but if on the contrary his sole object in convening this assembly was to protect Turner in the possession of his office against an illegal attempt to expel him by force, the defendant would not be liable.
Whether it would have been more discreet or not for the Coroner, under all the circumstances, to have foreborne farther efforts to execute the order until after the close of the defendant’s official labors for the day, he was not bound to do so.
Having gone peaceably and alone to serve the order, if (as he testified) he then distinctly stated to Mr. Ackerman, the person stationed by the defendant at the door of his office to announce the names of persons calling and their business, that he was a Coroner and had come with an order in a civil action for the arrest of the defendant, to execute it, and was notified by that person, after he had thereupon gone into the Mayor’s office, that he had orders to put the Coroner out of the office; the Coroner was-under no legal duty to forbear until some future occasion-, with a view to ascertain if he might then be permitted to-serve it.
But if, as Ackerman testifies, the Coroner did not state the object of his visit, but on the, contrary, on being told the Mayor could not see him that day as he was engaged, was asked “had you not better defer your business to some other time?” and he replied “very well, I will call again; good morning,” and then left, there would *38 be nothing in the interview itself which would justify him in then raising the power of the county to aid in executing the order.
But the mere fact that the Coroner had no cause for summoning a posse, is not a bar to this action. It is undoubtedly true that persons summoned to aid a Coroner in serving process will not be protected by the order of the Coroner, if he attempt to arrest a person not named in it. And if such person resist, and in making such resistance as is reasonably necessary to prevent being arrested, the posse are injured, no action can be maintained by them for such injury.
So, too, if the process should be executed in such manner as would make the Coroner a trespasser, as by forcibly breaking open the outer door of a defendant’s dwelling house, the Coroner and all participating in such misconduct would be liable in an action at the suit of a party thus illegally arrested. (Dalton on Sheriffs, 528; Elder v. Morrison, 10 Wend., 128; Curtis v. Hubbard, 1 Hill, 336; The People v. Hubbard, 24 Wend., 369.)
There may be other modes of abusing process, and other kinds of misconduct in the execution of it, in which those conscious of the abuse and misconduct and participating in it would find no protection in the fact that they were, at the time, a part of the Sheriff’s or Coroner’s posse.
But persons summoned as a posse are bound to aid in overcoming resistance if it be offered. They may lawfully attend the Sheriff or Coroner in obedience to his order, although he had no sufficient cause for summoning them. While they in his aid do nothing unlawful or in an improper manner, and have no reason to suppose that he intended in summoning them to use their services unnecessarily or unlawfully, his order protects them so far at least as to justify them in accompanying him.
And although, in this case, the Coroner summoned the posse without any reason to apprehend resistance, but when he came to the City Hall he found the assemblage in question, yet if he then informed the persons there *39 assembled that he had an order for the arrest of the defendant and had come to execute it, and if they, with this knowledge, resisted him to prevent his serving it, the posse might lawfully aid him; and it would be as truly their duty to aid him as, if being casually there, they had been summoned after the Coroner had informed the crowd who he was, and of his business, and had encountered resistance.
It is deemed important to state these propositions, inasmuch as we cannot foresee that even if the plaintiff shall ultimately recover, the question of damages, as whether they may be exemplary or must be strictly compensatory, may not be affected to some extent by the consideration whether the posse was summoned with or without cause. If summoned without cause, that fact will form a feature in the history of the case, and may qualify the character of the transaction as a whole, although the plaintiff’s right to recover may not depend upon proof of there being any cause for summoning a posse at the time it was summoned, or may not be impaired by proof that it was summoned unnecessarily.
There were many other exceptions taken at the trial which have not been noticed in the views already expressed, and which were not discussed on the argument of this appeal. If, upon another trial, there shall be an endeavor, as we may presume there will be, to present the case divested of all questions except those of substance, and to exclude all incidents not necessarily affecting the merits, many questions which we have omitted to decide may not again be raised.
.We do not deem it important to either party, to pass distinctly upon any questions not already considered. The views stated render it necessary to reverse the judgment and grant a new trial. The costs of the former trial and of this appeal, must be costs in the cause and abide the event.
Robertson, J.
Under the views taken by the learned Judge who presided at the trial of the issues in this case, *40 it would seem that the defendant could only be made liable, by proof of some direction by. him, to some one, to do some act which must necessarily lead to the'assault complained of, or of such a state of facts, as would legally throw the responsibility of it upon him, notwithstanding his absense at the time of its commission and his failure to participate in it; for he came to the conclusion upon the evidence, that “the defendant had no personal agency in such assault; was not present or assisting at it, did not give any orders for its commission,” and might be assumed to have known nothing.of its occurrence until after it had happened.
The learned Judge seems to have found something to fasten the responsibility of the act in question on the defendant, when he might not otherwise have been liable, in the character of the assembly; because he says, that although not legally liable for every illegal act done by the persons present at it, still, by being a member of it or guilty of convoking it, he was placed “in a position in which the law might cast upon him the consequences of the events which occurred.” As he subsequently arranged the different views that might be taken of the facts and their legal consequences, under different instructions, they may be assumed to comprise the circumstances which he considered would make the members or conveners of such an unlawful assembly responsible for any acts done by it. If, therefore, the fact of the assembly being unlawful, bore at all upon the defendant’s liability, either as a qualification of the propositions by which, under certain contingencies, as the Jury might find them, they were to make this defendant liable, or otherwise, it became material that the views of the Court should be correct on that point. The Jury were charged as matter of law that the assembly was in law, unlawful; and the mode in which it became so was detailed by the learned Judge; if there was, therefore, any inaccuracy in that view, the defendant was seriously prejudiced.
*41 There seem to be two modes in which an assembly of persons may become unlawful, so as to be a subject of indictment; one, by the purpose for which it meets, and the other, without regard to its purpose, by the numbers and demeanor of those present at it. (4 Black. Com., 146; 3 Inst., 176; 1 Hawk. Pl. C., 576; (Curw. ed.;) Russ. on Cr., 272.) The learned Judge seems to have considered the assembly in question to have been rendered unlawful in the second mode, because he stated that it was not essential that the object of the meeting should be wicked to render it illegal, and that if such illegality depended on such object, he would have submitted the question to the Jury, and also because he brought together in detail the elements which he considered likely to create public apprehension, out of which the unlawfulness arose, and they did not include the ' purpose of the meeting. He seems to have passed upon the effect of such elements as matter of law, without evidence of their actual effect, as has been allowed in similar cases. (Queen v. Vincent, 9 C. & P., 275.) It becomes necessary, therefore, to determine whether the evidence justified the assumption, as matter of law, of the existence in this case of the elements of illegality which were combined by him; whether they alone would constitute an illegal assembly; and whether there was no evidence of anything else to qualify their effect of standing alone. For this purpose the considerations of the ability of a body of legal policemen to accomplish every legal purpose for which the body in question met, and their own capacity to do mischief, if badly guided, may be laid out of view, as equally applicable to any large assembly, however tranquil or innocent.
The main circumstances from which the learned Judge drew the inference of the creation of apprehension in the public mind, and danger of a breach of the peace, which he considered essential to constitute the unlawfulness of an assembly where its purpose was out of view, besides numbers, were, the uniforms worn, the clubs carried, and obedience to orders issued by some of the assembly. I *42 think it will he found, on investigation, these existed circumstances in the case which might have deprived these of them terror to the public eye, and the Jury might have found they did so, if the question had been submitted to them. The actual number present, of those summoned by the defendant, does not seem to have greatly exceeded, if at all, two hundred ; these were in the City Hall, apart from the crowd in the park, whom, curiosity, or possibly a worse motive, drew together; they were divided again into two nearly equal parts, one of which was in the basement of the City Hall, out of view, while persons in pursuit of their lawful business went through uninterruptedly, except by the throng; very few were outside until the Coroner’s posse arrived. So far as appearances went, no visible body was so formidable in numbers as to create a consternation to passers by. Until'the arrival of such posse there does not seem to have been any tumult, outcries, threatening gesticulation, or brandishing of weapons, and there was no banner raised. The utmost latitude of interpretation of which, .their conduct seemed susceptible, was a determination to occupy and keep possession of the City Hall for some purpose. The uniform worn by such assembly was neither new, provided for the occasion, unusual or very plainly different from that required to be worn by the new police. Reasons of necessity, economy, or a belief that this was necessary to sustain the legal claim ■ to the old office of policeman, may as much have dictated the use of such uniform as a disorderly spirit. The clubs were not weapons of so warlike a character as to indicate,by the mere carriage of them, an intention to break the peace; besides which, their use might be lawful, in the legal purpose for which it was claimed such assembly was convened—the defense of the Street Commissioner’s office. Obedience to superior officers would seem to indicate rather an orderly than a disorderly disposition, unless directed to a breach of the peace. If the foregoing views be correct, there would seem to have been room for the Jury to have put a milder face upon the appearances at *43 the meeting in question, than that of the terror and threatened breach of the peace necessary to make it illegal. Another circumstance also detracts from the inference of public alarm by the meeting in question. Its members were, for all that appears, in law and in fact, Metropolitan policemen, created such by the new act, there being no evidence to show that they had refused to accept the new office or been deprived of it. (The People ex rel. McCune v. The Board of Police, 19 N. Y. R., 188.) The meeting of such officers, wearing their old uniforms, only distinguishable from those required by the new board to be worn by them, upon close examination, and carrying weapons to be borne by the new force, would not be so unquestionably likely to create public dismay as to render the meeting absolutely unlawful in itself.
The instruction, therefore, that the meeting in question was an unlawful assembly in law, which was equivalent to one that no other conclusion could be drawn from the facts, except the creation of public apprehension and danger by it, appears to me to have been erroneous; it is a hazardous exercise of judicial authority in any case to pronounce a meeting as menacing or dangerous to public tranquility, and, therefore, unlawful; but particularly in a country where large public meetings are constantly held for every conceivable object, and not always in the quietest manner, and where the practical experience of a Jury taken from the community at large could best determine what was likely to produce terror or danger.
Another injustice was done to the defendant in this case, by the determination that the assembly was an unlawful one, by reason of the conduct and appearance of those constituting it. Evidence was admitted of the declarations of third persons, when the defendant was not present, as to the object of the meeting; it is very evident that these could not be evidence against the defendant of his design in convening the meeting, or any complicity by him in the purposes of those going to it, any more than the acts of the members of such an assembly could be imputed to him, *44 when disconnected with the purpose which he might he legally proved to have had in convening it. It would be a mode of making the defendant liable for acts, to which he was in no way privy, of an assembly which he might have convened for a lawful purpose, and at which he was not present to control or influence it.
The fourth and fifth of the propositions to which the learned Judge reduced his views of the application of the law to the facts of the cáse are apparently equally untenable; the first of those two is to the effect that the mere fact of a Ooroner having once been at the office of the defendant to arrest him, imposed upon the latter the duty, upon being informed of such visit, of providing that the passage should be clear in case he returned; that proposition seems a necessary prelude to the next, which was i That even if the defendant endeavoured to secure uninterrupted access to himself by the Ooroner, yet, if the latter was resisted by the force collected by the former, after a public announcement by the latter, of his purpose, to such force, the defendant was liable, although the original purpose of the meeting was legal. These propositions can only be -sustained upon the principle that the defendant, having collected the force, was bound to see that it did not act illegally, or if it did, he was responsible; but no such principle is to be found in any case, and it is without any foundation in reason; no man is responsible for the misconduct of another unless he authorizes it expressly or impliedly, and no such authority is to be inferred from a request to numerous persons to meet to accomplish a legal purpose, although they afterwards act illegally when met. By such fifth proposition the defendant was made liable, although he might have done all he could to prevent a collision, or might be entirely ignorant of its imminence. The fourth proposition makes him liable, without notice of, or reason to suspect an intention to return; neither can be sustained upon any just principle.
The learned Judge also laid down another proposition to the Jury, adverse to received opinions, as to the power *45 of policemen and the right of the citizen to resist them in unlawful acts; which was, that the assembly of the force convened by the defendant was illegal, although its only object was to protect “the acting Street Commissioner in “ the possession of Ms office and properties against any “ attempts by Conover, with the assistance of the Metro- “ politan Police or others, to wrest that possession from “ him, notwithstanding such Commissioner were the lawful “ incumbent of the office, and M actual possession of it, “ and although an apprehension of a violent attempt on “ the part of the Metropolitan Police to force Conover mto “ the office might have been well founded." It would have been somewhat difficult to ascertain wherein the learned Judge understood the illegality of such assembly to exist, had he not added “ that there was no warrant in “ the law for organizing a body of men with offensive wea- “ pons, for the purpose of resisting legally constituted pro- “ tectors of the peace from an apprehension that they are “ about to commit a breach of the peace,” This would, however, still remain ambiguous as to whether the illegality lay in the arming with offensive weapons, or the intended resistance to legal policemen, had not that ambiguity been solved by the final statement that the proper remedy for individuals whose rights were unlawfully assailed by conservators of the peace, is to submit to the outrage and apply to courts or magistrates, subsequently, for redress. I do not, however, tffink the doctrine that policemen are not to be resisted, when guilty of any illegal trespass, could find favor in any courts except those of a despotic government; they certainly could not be arbiters upon an ex parte statement of the right' to the possession of an office. Public officers may be guilty of a riot, and any one is entitled to collect a force to subdue a riot. (1 Hawk. Pl. Cr., ch. 65, §2; Roscoe Cr. Ev., (3d ed.,) 883; 3 Burn’s Just., “Riot,” p. 743 note (6), Law’s opinion.) The class of men composing policemen would not always be the safest with whom to trust such arbitrary power. The charge was, therefore, clearly wrong in this particular, even if the words “ and others ” *46 had been omitted, by which the learned Judge declared it illegal for a magistrate to collect men to resist a threatened violent attack by any one to oust an incumbent from the occupation of the rooms occupied for the business of his office and the possession of the muniments of his office, without warrant of law.
The injury to the plaintiff may have been the result of planned misconduct of the defendant, or of a series of unfortunate misconceptions of intentions and rights, as may be hereafter determined;, but, considering the amount of injury inflicted, the amount of damages awarded does not seem to imply that the Jury were entirely satisfied it was the former. A trial in which all improper considerations may be excluded will do more justice to both parties. One important question, however, demands an expression of opinion from us before another trial, which is, whether the Coroner had a right to summon a posse in this particular case. The right of summoning a posse at all is made by the statute conferring it to depend on the public officer having the process to execute, “ finding or homing reason “to apprehend that resistance will he made to the execu- “ tion of it” (2 R. S., 440, § 80.) This certainly does not intend that such public officer shall have the absolute right to determine whether resistance will be made to such execution, because that would be equivalent to allowing Mm to summon assistance in any case he thought proper.
There must be such a state of facts existing as would afford reasonable ground for anticipating resistance, otherwise the officer has no right to call in assistance. That question was not submitted to the Jury in tMs case; but it was assumed that such reasonable ground existed, notwithstanding the conflict of evidence as to the treatment of the Ooroner on his first visit to the defendant’s office; as the Jury were charged “ that the men engaged with him “ in his attempt afterwards to enter the Oity Hall,” were in the performance of a legal duty. But it is contended on the part of the defendant that even if this were a case within the statute otherwise, the Ooroner has no power to *47 summon a posse until resisted; and the argument to sustain such a proposition is reducible to two principles: 1. At, common law the Coroner could only exercise such power as the Sheriff had as process-server, and not as conservator of the peace, and no statute has conferred on him any other. 2. The Sheriff’s power to summon a posse was only as conservator of the peace, in case of resistance and on final executions, and was derived exclusively from certain ancient English statutes which have not been affected by the Revised Statutes or the Code. These views, on examination, I think, will be found untenable.
The Revised Statutes, as amended in 1845, (2 R. S., 440, $ 80; Laws of 1845, ch. 69,) provide for summoning the power of the county in the case of process. The words of the amendment of 1845 confer the authority to raise the power of the county, in case of apprehended resistance to the execution of process, upon the Sheriff or any public officer to whom it may have been delivered; a subsequent section (§ 84) gives the Coroner the Sheriff’s power when the latter is party to the suit. The Code (§ 419) binds the Coroner to serve an order of arrest where the Sheriff is a party, the same as though it were process, and makes all its provisions applicable to Sheriffs applicable to Coroners; it also gives the Sheriff the same authority over the power of the county, in case of an order of arrest, as if it were process. (§ 185.) There is no room, therefore, for any doubt that the Code actually confers on the Coroner the same powers in serving an order of arrest as the Revised Statutes do on Sheriffs in case of process.
It is said, however, that the provision of the Revised Statutes is but a continuation of the Statute of Westminister, II, ch. 39, (2 Inst., 451,) by which, it is contended, no power is given to summon a posse upon mesne process. The answer to this is, that the Code uses the term order of arrest, about which there is no room for dispute; but even the Revised Statutes will be found to be a change of the phraseology of that statute, which requires the Sheriff to go in person “to do executionwhich, by a refined con *48 struetion, was held to be applicable only to final process, (Cro. Jac., 419; 1 Roll. R., 388, 440; 1 Roll. Abr., 807,) the Revised Statutes provide for the execution of any process, whether it be mesne or final.
But it is more than doubtful whether such overstrained construction of the Statute of Westminister has not since been overruled. There never was any doubt as to the power of the Sheriff to summon a posse to execute any process after resistance, (3 Inst., 161; 3 Hen. VII, Year Book, 1,) and his power to summon one, in any case, was always held to be at common law and not derived from the Statute of Westminister. (1 Inst., 193; Imp. Shff., 143.) Centuries ago it was held that the Sheriff could not set up an escape as a defense, when a prisoner, held on mesne process, was brought into Court on a habeas corpus, (Crompton v. Ward, 1 Stra., 433,) and the reason assigned by Pbatt, Ch. J., was that he had a right to the power of the county. But the right and duty of the Sheriff to employ the power of the county, if necessary, was fully settled in Howden v. Standish, (6 Com. B. R., 520,) when it was fairly presented; and it was determined that although an escape by rescue was a defense on mesne process, where he had no notice of such intent, yet when notified of such intent, he was bound to employ the power of the county to overcome resistance. And such the Revisers understood to be the law, as in their note to 1 Rev. Stat., 440, $ 80, they state that 1 Rev. L., 423, § 11, was varied, to declare the full extent of the power as it exists.
The judgments of the Metropolitan Police Commissioners, depriving certain officers of their places, were admitted notwithstanding objection, without due proof of personal service of notice of the charges against the officers, with the time and place of their proposed trial, so as to confer jurisdiction; and as they were admitted notwithstanding an objection, the exception thereto was well taken.
For these reasons, I think, the judgment should be reversed and a new trial awarded, with costs to abide the event.
*49 White, J.
One of the most important questions—perhaps the most important—in this case, respects the character of the assembly convoked by the -defendant on the 16th of June, 1857, at the City Hall, for the purpose, as alleged by him, of protecting Mr. Turner in the possession of the Street Commissioner’s office? and upon the occurrence of a collision between which assemblage and the Metropolitan Police, the plaintiff received the injury for which he brought this suit. That-assembly is said by the plaintiff to have been an unlawful one, and the Judge declared it to be so, in his charge to the Jury ? and, considering its peculiar spirit and composition, and all the circumstances of the time and occasion, I think the Judge charged correctly.
Previous to the passage of the act of April 15th, 1857, establishing a Metropolitan Police District, to consist of the counties of Hew York, Kings, Richmond and Westchester, the police force of the City of Hew York, comprising some eleven or twelve hundred men and officers, were known as the “ Municipal Police." Distributed and provided with station houses in appropriate districts throughout the city, they were uniformed, armed with clubs, organized and officered in sections or companies, with captains, lieutenants and sergeants, for the more efficient exercise of their functions. The Mayor was the head, and, with the Oity Judge and the Recorder, formed a Board of Commissioners to prescribe rules for the general government of the department.
In April, 1857, a change was made by the Legislature of the State. By the act then passed, (and which subsequently was adjudged constitutional, by the court of last resort,) the Metropolitan Police District, comprising the counties above mentioned, was established, and a police force was directed to be raised in each county, whose authority and duties should extend through the whole district. The act also created a Board of Commissioners for the government of the force thus authorized, which was to consist of five commissioners, to be appointed by the Gov *50 ernor, with the consent of the Senate. The Mayors of the cities of Hew York and Brooklyn were also to be, ex officio, members of this board. This act took effect on April 15th, 1857. By its provisions all former acts and provisions of law inconsistent with it were repealed, and the new Board of Commissioners became, upon their first meeting, vested with all the powers and authority conferred by it. That first meeting was held on April 23d, 1857, and at that instant all the functions .and authority of the old board, and of the Mayor as head of the Police Department, utterly ceased.
The defendant, however, being then Mayor of Hew York, refused to submit to this consequence. He denounced the law as unconstitutional, and openly set himself in actual physical hostility to it. He grasped the authority which the law declared to be now illegal in his hands, maintained the old organization in defiance of the supreme power of the State which had dissolved it, and announced his purpose to compel obedience to his commands, by the infliction of penalties upon such members of the old force as should violate his orders, or hesitate to acknowledge him as their head and superior officer.
On April 22d, 1857, he summoned all the captains of the old force, some twenty-two in number, and addressing them in a body, declaring those purposes, he said, among other things, after stating that he had commenced legal" proceedings to test the constitutionality of the law:
“I have sent for you to say that I am still your superior “ officer, and you must recognize no other, as I shall hold “any of you who may err from my orders to the strictest “accountability. *-*■** You are to obey no other “orders but mine until the Oourt decides the law to be constitutional. * * * * I desire you forthwith to “communicate my decision to the men under your com“mands, and say to them that this order issues from the “head of the Department. I hope you will bring all “your men to the most rigid accountability who shall “ dare violate my command. I- shall revive many ‘ orders’ *51 “that have become dead letters, and insist on their fulfill“ment.”
Influenced by the declarations and appeal thus made to them, the great majority of the old police confederated with the defendant in his revolt against the law; and continued in their organized resistance and violation of it, maintaining possession of all the police property and station houses of the city, and exercising all the functions and authority of policemen, under the defendant as their head, until after the happening of the events which gave rise to the subject of .the present suit.
In the meanwhile, the Board of Commissioners of the Metropolitan Police had proceeded under the law of April, 1857, to discharge the duties which it imposed upon them. They had established a police force, of which some members of the old body who had declined to follow the lead of the defendant, formed a part; and the spectacle was presented, in this great and popular city, of two opposing or rival bodies of men organized and armed within its limits, each claiming as against the other to be the rightful and exclusive .possessor of the important powers and privileges of public conservators of the peace, and each regarding the other as usurpers or unlawful intruders into office. There is, in the testimony in the case before us, abundant evidence of the jealousies and ill feeling necessarily generated by this condition of things between these two opposing bodies; and it required no extraordinary sagacity or discernment to foresee that by these conflicting claims the public peace could not long remain undisturbed, and that sooner or later, just such violence and collisions as have led to the present action miist inevitably ensue; and it is also most manifest that to the defendant, who, without justification or color of law, had entered upon the illegal course above stated, must exclusively belong the responsibility for all its necessary consequences.
In June, 1857, a controversy arose respecting "the title to the office of Street Commissioner of the City of Hew York. Daniel D. Conover claimed to be. the lawful *52 incumbent, and entitled to the possession of the office with all its records and appurtenances, under color of appointment by the Governor of the State. On the other side, Charles Turner, who was the deputy of the former commissioner, just deceased, claimed to be the lawful holder of the office, as successor of the deceased commissioner, until a new appointment should be made in the manner prescribed by the charter of the city. For some two or three days previous to June 16th, 1857, each claimant sought to obtain exclusive possession or cohtrol of the office or rooms in the Hall of Becords in which the business of the Street Commissioner’s Department was transacted. It was subsequently determined, upon legal proceedings, that Mr. Turner was the rightful incumbent; but at this time there was a personal struggle in progress between the parties, for the possession of the rooms; and Conover had been forcibly ejected from them by Municipal policemen acting under the orders of the defendant; and it was said to be apprehended that the Metropolitan Police might, on the 16th of June, forcibly restore Conover, or put him again in the occupation or possession of those rooms.
In the anticipation, the defendant alleges, of such an attempt, and with the design to prevent it, he collected within and around the City Hall, during the evening or night of the 15th, and in the forenoon of the 16th of June, a formidable force of some six or seven hundred members of the Municipal Police, all, or nearly all, fully uniformed and equipped. They filled the City Hall, partially closed the gates, and placed strong guards at its entrances, and were ordered to allow none to enter but certain persons designated, the defendant, during the whole day, remaining in his office within the building. This is the assembly which it is alleged by the plaintiff, and denied by the defendant, was an unlawful one. No attempt was made that day, or at any other time, by the Metropolitan Police, to reinstate Mr. Conover in the possession of the Street Commissioner’s office.
*53 An order for the arrest of the defendant and other persons, including the Sheriff, had been granted that day in an action brought against them by Mr. Conover, for his forcible ejection above mentioned. The Coroner of the city, in attempting to serve the order, (luring the forenoon of that day, upon the defendant, the Mayor, believed that he was willfully resisted, and applied for and obtained a body of fifty Metropolitan policemen, as a posse, to aid him in executing the order. On attempting to enter the City Hall for that purpose, the Coroner and his posse were resisted by the Municipal Police congregated there by the defendant, and in the violent conflict, of b.ut a few moments duration, which ensued, the Coroner and the Metropolitan Police were beaten back, and the plaintiff and several others of the Metropolitan force were badly injured.
On the trial the plaintiff insisted, and the defendant denied, that this assembly of Municipal policemen was convoked by the defendant for the purpose of resisting any attempts that might be made to arrest him. The testimony was conflicting on this point; but as the Judge charged the Jury, as matter of law, that, in every aspect of the question which the case might present, the assembly was an unlawful one, the propriety of this charge must be considered upon the defendant’s ground, namely, that he had assembled them only to protect Mr. Turner in the possession of the Street Commissioner’s office.
But, admitting all that, the unlawful character of the assembly still remained. It was a body of men maintaining, in defiance of law, an official organization and usurping an official authority in the community, of a most dangerous character when illegal and unwarranted. Where-ever they moved and whatever they did, in this unlawful combination, there was presented on then front this primary characteristic of resistance to and contempt for lawful authority. They bore this about with them, and could nowhere be assembled, in their usurped capacity of a police organization, without being an offense to the law, and a scandal to the peace and good order of society., And the *54 defendant could not convoke such a body, could not wield this organized power, which he sought to hold together in disregard of the mandates of the law, without bearing, himself, the principal burthen of the trangression.
In all cases it is justifiable, and in some even commendable, to.-, take legal proceedings to test the constitutionality of a law regularly enacted. But such proceedings bear no resemblance to the acts of the defendant and his confederrates in the instance before us-. It is true that he .appealed to the Courts for their judgment upon the character of the law which he deemed offensive; but, at the same time, he moved in the track of disorder and sedition pari passu with the legal proceedings which he instituted.
In a case-like this, I think it is important that we should declare that strict obedience to law, and especially to law involving the security of social order, is a duty that, under institutions like ours; admits of no exception. There are so many safeguards against oppression in our system of society, so many peaceful and legal modes provided for redress of any possible grievance, so many periodical opportunities secured to every citizen for the most radical and yet peaceful reconstructions and reformation of what- , ever may be deemed vicious or inequitable, even in organic law, that no excuse should prevail among us for anything like force or violence, for anything savoring of that revolutionary anarchy, which, under other forms of government, is the dangerous, but sometimes the only resort for relief .from intolerable wrong.
I think, therefore, upon the grounds which I have above stated, that the assembly in question, convoked by the .defendant at the Oity Hall, was an illegal body; and that whenever it was convoked, as in the present instance, for •the employment of its organization as a police force, not only without warrant of law, but contrary to the provisions of law, and in defiance of the duly constituted authorities, it was an unlawful assembly. And if it should be ■ deemed necessary, in order to give to it the character of .an unlawful assembly, in the common law acceptation *55 of that term, which requires that it should be shown to have been attended with circumstances calculated to excite alarm, to endanger the public peáce, and raise fears and jealousies among the citizens. (1 Hawk. P. C., ch. 65, § 9.) I think that it appears, from the testimony in the case, to have been attended by all those circumstances. Much excitement existed previous to its convocation, caused by the attitude of resistance to the law, assumed by the defendant and the Municipal Police. This excitement was increased by the contest respecting the Street Commissioner’s office, in which the police on both sides became involved; and when, on the 16th of June, the defendant filled the City Hall with this unprecedentedly numerous assemblage of the policemen maintained by him, in my estimate of the successive facts disclosed by the testimony, I think that all the conditions of the common law definition of an unlawful assembly were fulfilled. And none appeared to be more impressed with a conviction that such circumstances of terror existed on that day as would endanger the public peace, and raise fears and jealousies among the citizens, than the defendant and the Metropolitan Police Commissioners.
The former, on the afternoon of the 16th of June, issued a proclamation “ To the People oe Hew York,” in which he says:
“ As if the usurpers of your municipal rights were not “ content with act after act of unjustifiable, illegal and “ tyrannical enactments, they have this day attempted to “ take life in an effort to degrade you through my person. “ But for the efforts of myself and those under my com- “ mand, your streets would have been deluged with blood, “ and your property destroyed. In this emergency, and at “ this crisis in the government of the city, I call upon you “ to remain calm, to observe the laws, to respect persons “ and property, and to avoid excitement and collision.”
The President, of the Metropolitan Board of Police also issued a proclamation at the same time, and on the same subject, in which, after referring to “ the unusual excite *56 ment prevailing in the city,” he says that, “ the peace “ of the city and the protection of property require the “ promptest and most decided measures,” and that, “hun- “ dreds of substantial citizens had offered their services as “ special policemen, and a sufficient number of them had “ been accepted.”
On the whole testimony there appears to me to have been nothing wanting to have constituted that assembly an unlawful one.
Eo defense, or even palliation of the defendant’s proceedings, nor of the conduct of the old police force which adhered to him, can be predicated upon the fact that the law of April 15th, 1857, enacted that the police then existing in Eew York “ shall hold office and do duty under the provisions of this act.” Those policemen spurned that act; they denied its validity, disclaimed all connection with it, or that they acted under it, and, in fact, did no duty under it. The terms of the act are in the conjunctive, “that they shall hold office and do duty under it.” They could not claim to hold the office while withholding the duty. But, independent of that consideration, it would be a manifest paradox to say that those men could deny and resist the law, and at the same time uphold and claim protection under it. They repudiated the law, refused to act, and did not act under it, and could not, while thus resisting it, claim that it conferred upon them any function, authority or protection.
But, notwithstanding that I hold the views which I have above expressed, respecting the character of the assembly convened by the defendant, I concur in the conclusions of the Court upon the other points discussed, and think that a new trial should be ordered.
All the Justices concurred in granting a new trial.